**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JESSICA LYNN BORDELON,<br><br>                    Plaintiff,<br><br>        vs.<br><br>EQUIFAX INFORMATION SERVICES,<br>LLC,<br><br>                    Defendant. | Civil Case No.:<br><br><br>**COMPLAINT AND DEMAND<br>FOR JURY TRIAL** |

Jessica Lynn Bordelon ("Plaintiff" or "Ms. Bordelon") by and through the undersigned counsel, brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax") and states as follows:

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this

1

potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.
> *See* 15 U.S.C. § 1681(a)(1).

7.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or

2

uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)]

(emphasis added).

8.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11. Plaintiff's claims arise out of the Defendant's blatantly inaccurate credit reporting, wherein the Credit Bureau Defendant reported to Plaintiff's potential creditors that Plaintiff still owed a balance on student loan debt that was otherwise discharged.

12. Accordingly, Plaintiff brings claims against the Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

14. Jessica Lynn Bordelon ("Plaintiff" or "Ms. Bordelon") is a natural person residing in Lockport, New York, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15. Defendant Equifax Information Services, LLC. ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Florida, including within this District.

16. Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

4

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

**A.      Summary of the Fair Credit Reporting Act**

19.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

20.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

21.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  *See* 15 U.S.C. § 1681(b).

22.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to

5

ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

23.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**B.    Factual Background**

24.    The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting.  Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

25.    The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

26.    Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27.    Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Defendant, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

28.    The Defendant's consumer reports generally contain the following information:

(1)    Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

(2)     Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

(3)     Public Record Information: this section typically includes public record information, such as bankruptcy filings; and,

(4)     Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

29.     The Defendant obtains consumer information from various sources. Some consumer information is sent directly to the CRA by furnishers.

30.     The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like the Defendant) to make lending decisions.

31.     Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the Defendant's consumer reports.

32.     The information the Defendant includes in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

33.     FICO Scores are calculated using information contained in the Defendant's consumer reports.

34.     The Defendant knows that FICO and other third-party algorithms (as well as the algorithms owned by the Defendant) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

35.     The Defendant knows that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

36.     DTI compares the total amount a consumer owes to the total amount a consumer earns.

37.     The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

38.     The Defendant routinely reports inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

39.     The Defendant fails to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

40.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against the Defendant for its inaccurate credit reporting.

41.     Thus, the Defendant is on continued notice of its respective inadequate reporting procedures.  Specifically, the Defendant is on notice that its inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

42.     The Defendant has received and documented many disputes from consumers complaining that Defendant reported inaccurate information about them.

**C.     Plaintiff Secures Student Loan Debt Discharge**

43.     As of 2011, Plaintiff was rendered disabled.

44.     As a result, CUNY/Brooklyn College discharged Plaintiff's student loans.

**D.     Defendant Inaccurately Reports Plaintiff's Discharged Student Loan**

45.      In or about 2022, Plaintiff decided she was ready to purchase a home and needed to secure a mortgage.

46.      In anticipation of completing and submitting a mortgage application, Plaintiff reviewed her credit reports and was shocked to discover that Defendant was reporting her CUNY/BROOKLYN COLLEGE Account (Account No. XXX9A45), a discharged student loan account, with a balance owed.

47.     Plaintiff was confused and distressed by this information.  The student loan had been discharged in its entirety, but Defendant was reporting a balance.

**E.     Plaintiff's Dispute to the Defendant Regarding the Inaccurate Credit Reporting**

48.     In or about June or July 2022, Plaintiff deeply troubled by the inaccurate reporting of the CUNY/Brooklyn College account by Equifax, disputed the same with Equifax.

49.     On or about July 13, 2022, Equifax responded to Plaintiff's dispute by modifying the additional information and historical information sections.

50.     Equifax continued to report that Plaintiff owed a balance on the CUNY/Brooklyn College account.

51.     In or about September 2022, extremely shocked, surprised, and distressed at Defendant's continued inaccurate reporting, Plaintiff again disputed Defendant's reporting of the CUNY/BROOKLYN COLLEGE Account, in detail, by mailed letter with relevant enclosures.

52.     In her mailed dispute, Plaintiff explained that any indication that she owed a balance in relation to her CUNY/BROOKLYN COLLEGE student loan account was inaccurate.

53.     Plaintiff requested that Equifax reinvestigate the disputed information, correct the reporting, and send her a corrected copy of her credit report.

54.     Enclosed with her mailed dispute to Equifax was proof of address, proof of identity in the form of her driver's license, and documents supporting her dispute statement that she no longer owed a balance on her CUNY/BROOKLYN COLLEGE account.

**F.     Defendant Equifax's Unreasonable Dispute Reinvestigation**

55.     Upon information and belief, Equifax failed to send an automated credit dispute verification ("ACDV") to the furnisher of the information, CUNY/Brooklyn College, pursuant to Plaintiff's June/July 2022 dispute to Equifax.

56.     Upon information and belief, Equifax failed to send an automated credit dispute verification ("ACDV") to the furnisher of the information, CUNY/Brooklyn College, pursuant to Plaintiff's September 2022 dispute to Equifax.

57.     Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's June/July 2022 dispute.

58.     Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's September 2022 dispute.

59.     Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's June/July 2022 dispute.

60.     Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's September 2022 dispute.

61.     Thereafter, Defendant Equifax failed to correct or delete the balance owed on the CUNY/Brooklyn College account.

62.     Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered June/July 2022, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

63.     Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered September 2022, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**G.     Defendant's Method for Considering Consumer Credit Report Disputes**

64.     The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

65.     The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

66.     That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

67.     It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

68.     Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

69.     Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

70.     The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

71.     These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

72.     Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

73.     The data furnishers, like Defendant CUNY/Brooklyn College, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

74.     Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

75.     Upon information and belief, Equifax had failed to send an ACDV to CUNY/Brooklyn College in response to any of Plaintiff's disputes since June/July 2022.

76.     Plaintiff reasonably believes that the Defendant continued to publish that Plaintiff owed a balance on the CUNY/Brooklyn College student loan after the debt was discharged and after Plaintiff's disputes of the same in 2022.

77.     As a result of the inaccurate 30-days late notation, and despite Plaintiff's debt having been discharged by CUNY/Brooklyn College, the Defendant made it practically impossible for Plaintiff to continue to obtain credit.

78.     On or about November 2, 2023, Plaintiff applied for a credit card with PenFed, which application was denied.

79.     Upon information and belief, PenFed obtained a copy of a consumer report from Defendant, and, based on that consumer report, denied Plaintiff's application for credit.

80.     Since discovering the inaccurate student loan balance as reported by Defendant, in late-2021, Plaintiff spent multiple hours on the phone with Federal Student Aid and CUNY/Brooklyn College, attempting to have the inaccurate reporting corrected.

81.     The inaccurate balance as reported by Defendant quickly became a significant source of distress and anxiety to Plaintiff, which remains continuing and ongoing.

82.     At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

83.     At all times pertinent hereto, the conduct of Defendant, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

84.     The Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs.  Accordingly, the Defendant's violations of the FCRA are willful.

85.     As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### First Claim for Relief Against Defendant Equifax

86.     Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

87.     The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates.

> 15 U.S.C. §1681e(b) (emphasis added).

88.     On numerous occasions, Defendant prepared patently false consumer reports concerning Plaintiff.

89.     Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

90.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

91.     As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

92.     Defendant's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

93.     Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**Second Claim for Relief Against Defendant Equifax**

94.     Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

95.     The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1).  The Act imposed a 30-day time limit for the completion of such an investigation.  *Id*.

96.     The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

97.     On at least one occasion during the past two years, Plaintiff disputed the inaccurate information with Equifax, and requested that it correct and/or delete a specific item in her credit file that is patently inaccurate, misleading, and highly damaging to her, namely, any notation suggesting she owed any balance on the CUNY/Brooklyn College student loan account considering it was previously discharged.

98.     In response to Plaintiff's dispute, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

99.     Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

100.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate

credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

101.    Defendant's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

102.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

a)     Determining that Defendant negligently and/or willfully violated the FCRA;

b)     Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

c)     Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

d)     Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: January 25, 2024                    **CONSUMER ATTORNEYS**

                                    By:       */s/ Levi Y. Eidelman*
                                              Levi Y. Eidelman, NY Bar No. 5742499
                                              300 Cadman Plaza West, 12th Floor
                                              Brooklyn, NY 11201
                                              T: (718) 360-0763
                                              F: (718) 715-1750
                                              E: leidelman@consumerattorneys.com

                                              *Attorneys for Plaintiff*
                                              *Jessica Lynn Bordelon*

18